FILED
2011 Nov-30  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JULIANNE SHERMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:3:11-CV-0187-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social,** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

### I. INTRODUCTION

On October 10, 2007, the claimant, Julianne Sherman, filed an application for a period of disability, disability insurance benefits, and supplemental security income alleging that she had become disabled on August 4, 2007 because of bipolar disorder, history of poly substance dependence, and personality disorder. (R. 14, 99).   The Commissioner initially denied the claim on November 9, 2007. (R. 103).  The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on September 2, 2009.  (R. 14).  A vocational expert appeared and offered testimony at the hearing. (R. 28).  In a decision dated January 21, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for a period of disability, disability insurance benefits, and supplemental security income. (R. 30).  On December 14, 2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1).  The claimant has exhausted her

administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405 (g) and 1631 (c)(3).  For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presented one issue for review: Did the ALJ err in discounting the medical opinions of Drs. Ahmad and Atkins?

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405 (g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No ... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision fo the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the

2

ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person uanble to perform any other work within the economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The basic rule of the Eleventh Circuit is that the Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). However, when an ALJ evaluates medical evidence, "the testimony of a *treating physician* must be given substantial or considerable weight unless 'good cause' is shown to the contrary. A *treating* physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (emphasis added) (citation and internal quotation omitted). When discounting the opinion of a treating physician, the ALJ must clearly articulate his reasons. *Phillips v. Barnhardt*, 357

F.3d 1232, 1241 (11th Cir. 2004).

# V. FACTS

The claimant, Julianne Sherman, was born on July 15, 1977. (R. 1).  She has a high school diploma and was thirty-two years old at the time of the administrative hearing for the current claim. (R. 1).  Her past work experience includes full-time and part-time employment as an assistant to a veterinarian, a delivery woman for a furniture store, a construction worker, a fast food cook, a bartender, a retail worker, and a store manager of a sporting goods store, and part-time employment cleaning houses and dog kennels and doing yard work. (R. 69-71, 159, 168).  The claimant initially alleged disability beginning on August 4, 2007 because of her bipolar disorder and personality disorder.  At the hearing before the ALJ, claimant argued that she was disabled based on bipolar disorder, history of poly substance dependence, and personality disorder. (R. 23).

## *Background and Medical History*

On May 10, 2001, claimant was hospitalized with diagnoses of alcohol abuse, acute, severe; cocaine dependence; marijuana dependence; poly drug abuse including ecstasy and opiates; and schizoaffective disorder, chronic, severe with acute depression and psychotic decompensation.  (R. 304, 479).  She was again hospitalized on October 26, 2001 with diagnoses of schizoaffective disorder, chronic, severe; acute psychotic and manic decompensation; history of marijuana abuse; history of alcohol abuse; history of substance abuse; and borderline, narcissistic and histrionic features. (R. 295, 463).  Only two days after she was discharged, on November 3, 2001, claimant was again hospitalized with diagnoses of alcohol abuse; cocaine dependence; marijuana dependence; poly drug abuse including ecstasy and opiates; bipolar

affective disorder with mixed manic exacerbation; alcohol intoxication; and some borderline, narcissistic, histrionic features. (R. 283, 454).

Between December 2002 and April 2008, claimant was seen several times in the emergency department for a variety of minor injuries and illnesses including right knee pain, a laceration to her left index finger, acute bronchospasm, bronchitis, acute sinusitis, gastroenteritis, upper respiratory infection, otitis media, insect bite, bipolar disorder, and a nasal fracture suffered while playing softball.  Claimant was also treated at Good Samaritan Clinic several times between November 2004 and March 2007.  On November 23, 2004, claimant was seen for medication for depression, popliteal cyst of the knee, Pap smear, medication for chronic obstructive pulmonary disease, and irritable bowel syndrome. (R. 322).  She reported that she had been taking Klonopin and Effexor for her depression and Albuterol for chronic obstructive pulmonary disease.  In January 2005, claimant was treated for probable oral thrush. (R. 321).  Later in 2005, an undated note from the Good Samaritan Clinic stated that the claimant was out of Effexor, complained of obsessive-compulsive disorder, cough and left hip pain. (R. 320).  Claimant was last seen at Good Samaritan Clinic on March 22, 2007, complaining of cough and nasal congestion, which was diagnosed as asthmatic bronchitis. (R. 318).

On December 6, 2005, claimant first reported to Dr. David E. Harding that she had attention deficit disorder (ADD), obsessive-compulsive disorder, bipolar disorder, and chronic obstructive pulmonary disease (COPD), and was taking Klonopin, Effexor, and Adderall. (R. 334).  Claimant stated that she was doing well on Effexor and reported that she continued to use marijuana intermittently.  Claimant also complained of fatigue and a left hip labial tear, for which she was seeing Dr. Fowler, an orthopedic physician.  Dr. Harding agreed to refill claimant's

5

Klonopin, Effexor, and Adderall prescriptions.

Claimant returned to Dr. Harding on January 19, 2006.  Dr. Harding noted that claimant exhibited situational anxiety and gave her Ativan at her request. (R. 333).  Claimant again returned to Dr. Harding on February 16, 2006 demanding Lortab 5 for pain in her hip. (R. 331).  Dr. Harding's office contacted Dr. Fowler's office and discovered that Dr. Fowler had been trying to taper off claimant's Lortab dosage and that claimant was scheduled to undergo hip surgery in Nashville, Tennessee on March 2, 2006.  Dr. Harding then refused to give claimant Lortab.

On April 24, 2006, claimant returned to Dr. Harding requesting enough Klonopin and Adderall to last for six months because claimant had lost her job. (R. 329).  Claimant reported that she was under a lot of stress and was not sleeping because of her anxiety.  Dr. Harding diagnosed insomnia, history of bipolar/manic depression, attention deficit hyperactivity disorder (ADHD), and obsessive-compulsive disorder, but reported that he was not giving her any medication on that day.  He stated that claimant could come and get her medications as scheduled.  Claimant returned in May and June of 2006 and was given samples of Effexor.

Claimant began treatment at Indian Rivers Community Mental Health/Mental Retardation Center in June 2006.  On September 22, 2006, Dr. Syed R. Aftab, a psychiatrist, saw claimant. (R. 359).  His impression of claimant was major depressive disorder, moderate, recurrent; rule out bipolar affective disorder; and history of poly substance dependence.  He increased claimant's Effexor and prescribed Vistaril.  Claimant returned to Dr. Aftab on December 22, 2006 for followup. (R. 358).  Claimant reported that she had been fatigued and had been hurting herself and that she needed Adderall and Klonopin to make her get up and stop hurting herself.

6

Claimant stated that she had been getting Adderall and Klonopin off the streets.  Dr. Aftab noted claimant's focus on Adderall and Klonopin.  Dr. Aftab refused to prescribe Adderall and Klonopin, as well as any other stimulants or benzodiazepines, to claimant because of her history of substance abuse.  Treatment notes indicate that claimant became very agitated and angry when he refused to give her Adderall and Klonopin.

On January 31, 2007, claimant was seen by Dr. Florino Samson, another psychiatrist at Indian Rivers, because she was not happy that she was not being given benzodiazepines. (R. 356).  Dr. Samson continued claimant on Effexor and started her on Luvox and Lamictal.

Claimant was next seen by Dr. Edward Bradley, another psychiatrist at Indian Rivers.  On August 7, 2007, claimant reported mood swings, thought racing, and persistent insomnia. (R. 355).  Dr. Bradley diagnosed claimant with bipolar disorder, most recent episode mixed with psychosis, along with comorbid history of poly substance dependence, and personality disorder, not otherwise specified with cluster B features.  Dr. Bradley continued claimant on Effexor and added Tegretol.  Claimant returned to Dr. Bradley on September 7, 2007 for followup. (R. 354).  Claimant reported that Effexor and Tegretol were working well, that she was sleeping more,  that she had fewer mood swings and less irritability, and that she had no lethality towards herself or others.  On October 5, 2007, claimant told  Dr. Bradley that she was still smoking marijuana, against which he advised. (R. 353).  Claimant also denied lethality towards herself.  Claimant noted generally good clinical effects of the Effexor and Tegretol.  However, on December 3, 2007, claimant returned to Dr. Bradley complaining of an increase in mood lability and difficulty sleeping.  (R. 351).  She denied substance abuse and lethality towards herself.  Dr. Bradley adjusted claimant's medications.

7

Claimant filed applications for a period of disability, disability insurance benefits, and supplemental security income on October 10, 2007 alleging that she became disabled on August 4, 2007.  She subsequently completed a work history report, a drug and alcohol questionnaire, and daily activities questionnaire on October 25, 2007. (R. 167-185).

The state agency psychiatrist, Dr. Robert Estock, completed a psychiatric review technique form and a mental residual functional capacity assessment on November 7, 2007. (R. 371-388).  In his psychiatric review technique, Dr. Estock opined that claimant sufferend from affective disorders, personality disorders, and substance addiction disorders per her medical history. (R. 371).  He found that she specifically suffered from bipolar disorder, personality disorder not otherwise specified with cluster B features, and a history of poly substance abuse per her medical history. (R. 374, 378, 379).  He determined that claimant suffered mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had no episodes of decompensation. (R. 381).  Dr. Estock noted that claimant's symptoms are partially credible and that indications are that as long as claimant stay on her medications, she is stable. (R. 383).

On March 5, 2008, claimant returned to Dr. Bradley reporting that she had forgotten to take her medications for several days and that, as a result, she had become more hostile, agitated, and moody. (R. 350).  Claimant denied illicit drug use and lethality towards herself.  Dr. Bradley continued claimant on her medications and advised her to take them regularly.  After missing two visits in early May 2008, claimant returned to Dr. Bradley for  followup on May 27, 2008 complaining of decreased levels of energy, concentration, and memory; and increased agitation, hostility, and sadness. (R. 348).  Dr. Bradley continued the claimant's medications and instructed

her to follow up again in two months.

Between July and December of 2008, Diann Crane, a nurse practitioner at Indian Rivers, saw claimant three times for increased sleep, agitation, hostility, and sadness, as well as decreased energy, concentration, and memory. (R. 341-347). Claimant denied substance abuse and lethality towards herself. She claimed that she had been taking her medication regularly, only missing one week of Tegretol over the several month time line. Ms. Crane continued claimant on her medication regimen of Tegretol and Effexor.

In December 2008, claimant underwent an extensive evaluation at Indian Rivers and the staff completed a "daily living activities: adult mental health" form indicating that claimant was within normal limits or had only moderate impairment in activities such as health practices, housing stability and maintenance, communication, safety, managing time and money, nutrition, problem solving, family relationships, alcohol/drug use, leisure, community resources, social network, sexuality, productivity, coping skills, behavior norms, personal hygiene, grooming and dress. (R. 338). Claimant reported trouble with memory and ability to concentrate but denied delusions and hallucinations, specifically reporting that she had not experienced visual or auditory hallucinations in seven or eight years.

On January 28, 2009, claimant began treatment with Dr. Kazi Ahmad, another psychiatrist at Indian Rivers. (R. 396). Claimant complained of decreased energy level, concentration, memory, and weight as well as increased sleep, agitation, hostility, and sadness. She denied hallucinations, delusions, and paranoia. Dr. Ahmad diagnosed bipolar disorder per chart, increased claimant's Effexor and continued her Tegretol. Claimant returned to Dr. Ahmad on February 26, 2009, again reporting that she had no energy and was sleeping too much, but

9

denying depression, use of drugs or alcohol, and hallucinations. (R. 390).  Claimant alleged that she was more irritable, but Dr. Ahmad noted that her affect was appropriate and that she was alert and oriented in all areas.  Dr. Ahmad then decreased claimant's Effexor.

Dr. Ahmad completed a medical opinion regarding ability to do work-related activities (mental) on May 13, 2009 that claimant's counsel's law firm prepared. (R. 406-407).  He indicated that claimant was seriously limited, but not precluded from, remembering work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, asking simple questions or requesting assistance, responding appropriately in a routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions, understanding and remembering detailed instructions, and carrying out detailed instructions.  He stated that claimant was unable to meet competitive standards related to maintaining attention for two-hour segments, maintaining regular attendance and being punctual within customary usually strict tolerances, working in coordination with or in proximity to other employees without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length or rest periods, setting realistic goals or making plans independently of others, and dealing with stress of semiskilled and skilled work.  He also reported that claimant had no useful ability to function in accepting instructions and responding appropriately to criticism from supervisors and getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes.  He also opined that claimant was seriously limited, but not precluded from, interacting

10

appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, traveling in unfamiliar places, and using public transportation.  He indicated that her impairments or treatment would force claimant to be absent from work more than four days per month.

On May 3, 2009 claimant reported to Northport Medical Center's Emergency Department for depression, hostility, and agitation. (R. 422-431).  Claimant reported to Dr. Jimmy Tu that she had a history of bipolar disorder and told him that she has a bad day that requires her to come to the emergency department once every six to eight months and that receiving Ativan and Haldol makes her feel better.  However, claimant received no prescriptions.

Claimant saw Dr. Patrick Bruce Atkins, a psychiatrist, on July 21, 2009 on referral from her attorney. (R. 493-496).  Claimant told Dr. Atkins that she had a history of substance abuse and marijuana abuse with her last use two months prior and that she had suffered her last hallucination around approximately the same time.  Dr. Atkins's impression was schizoaffective disorder, bipolar type, with intermittent hallucinations and psychotic features; self injurious behavior syndrome with skin picking, burning, and cutting behavior; and marijuana dependency in remission.  He determined that claimant had a severe incapacity to relate socially and occupationally and that she met the criteria for chronic mental disorder in the severe range that incapacitated her from work 100 percent and that her condition was permanent given the longevity of her condition.  He stated that in his opinion, substance abuse was related to claimant's condition.

Afterwards, Dr. Atkins completed the same medical form regarding ability to do work-related activities (mental) that Dr. Ahmad completed. (R. 498-499).  Dr. Atkins reported that

11

claimant was seriously limited, but not precluded from, maintaining attention for two-hour segments, making simple work-related decisions, performing at a consistent pace without an unreasonable number and length of rest periods, adhering to basic standards of neatness and cleanliness, traveling in unfamiliar places, using public transportation, and asking simple questions or requesting assistance.  He reported that claimant was unable to meet competitive standards related to remembering work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being unduly distracted, interacting appropriately with the general public, and setting realistic goals.  He stated that claimant had no useful ability to function in maintaining regular attendance and being punctual within customary usually strict tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions, understanding and remembering detailed instructions, carrying out detailed instructions, maintaining socially appropriate behavior, and dealing with the stress of semiskilled and skilled work.  Dr. Atkins opined that claimant would be absent from work more than four days per month due to her impairments or treatment.

*The ALJ Hearing*

After the Commissioner denied claimant's request for a period of disability, disability

insurance benefits, and supplemental security income on November 9, 2007, the claimant requested and received a hearing before an ALJ. (R. 103). Prior to the hearing on September 2, 2009, the ALJ ordered claimant to undergo a consultative examination, but at her counsel's instruction, claimant failed to appear. (R. 59-60). Claimant's counsel argued that claimant did not have an obligation to attend a consultative examination that the Administration ordered because there was sufficient medical information available. (R. 60). The ALJ told claimant's counsel that he felt a consultative examination would be appropriate in this case; however, claimant's counsel still refused. (R. 61). Claimant's counsel offered to send the ALJ a brief on the matter and after some discussion, the ALJ and claimant's counsel agreed to disagree for the time being. (R. 62, 65).

Claimant's counsel began the hearing by questioning claimant regarding her work history since her alleged onset date of disability of August 4, 2007. Claimant testified that she had been working since her alleged onset date for Miss Emily Crowley and Miss Angie Knight. (R. 69). Claimant testified that she tended to the yard and cleaned the home of Miss Crowley two days a week when she was able and that she had no set hours. (R. 69-70). She claimed to make up to $100 per week working for Miss Crowley. Claimant then testified that she also worked one day per week at the home of Miss Knight, cleaning her pet kennels and feeding her dogs for around $65 per week. (R. 71). Claimant further testified that she must set an alarm reminding her to take her medications or her roommate must give them to her. (R. 72). Claimant alleged that she is unable to work because she cannot cope with everyday life because of her irritability. (R. 73). Claimant's counsel continued by questioning claimant regarding her prior work history.

The ALJ then questioned claimant regarding her age, education, and work experience.

13

Claimant testified that she was thirty-two years old, had graduated from high school, and had worked in a number of jobs since 1994. (R. 78, 79).  Claimant testified that her last full-time job had been working for a veterinarian doing a variety of tasks, from bailing hay to cleaning kennels to assisting in animal surgeries. (R. 79).  Claimant went on to testify that she had also worked for Play It Again Sports as an employee and had worked her way up to handling its ordering and receiving of inventory. (R. 80).  Claimant also testified that she had worked as an inventory manager at Play It Again Sports. (R. 81).

The ALJ went on to question claimant concerning other jobs that she had held in the past fifteen years as a bartender, a cook, a supervisor of a small construction crew, and as a delivery person for a furniture company.  He inquired into the type of work performed and the heaviest lifting that claimant was required to do in each of those jobs, the heaviest being around fifty pounds. (R. 81-83).

The ALJ then asked claimant where she was living.  Claimant testified that she lived in a mobile home that her roommate, Amanda Haddock, owned.  Claimant further testified that Ms. Haddock is the primary wage earner in the household and that she handles claimant's money for her.  (R. 84-85).

The ALJ next questioned claimant concerning her drug and alcohol use.  Claimant claimed that she was no longer using alcohol or drugs.  (R. 85-86).  She claimed not to have used alcohol since 2003 or drugs, other than marijuana, since she turned twenty-seven years old. Claimant admitted to using marijuana as recently as May 2009. (R. 86).  Claimant testified that at age twenty-seven, she was using both crack cocaine and powder cocaine. (R. 86).  However, claimant testified that she had never been fired as a result of her alcohol and/or drug use. (R. 86).

The ALJ then asked claimant to describe a typical day.  Claimant stated that Ms. Haddock wakes her up at 5:00 am to take her medicine, but that she then goes back to sleep until 9:30 or 10:00 am.  She then showers and works on her "lists" for the day.  Some days claimant then goes to work and at the end of the day she tries to cook dinner. (R. 87).  The ALJ asked claimant if she was involved in any other social activities.  Claimant stated that she used to play softball, but had stopped around two years before because she "knows how people are and how people can hurt you in different ways" and she would rather not risk being associated with anyone who is capable of hurting another person. (R. 87).

The ALJ then interviewed Ms. Norma Jill Jacobson, a vocational expert (VE).  The VE testified that claimant's past work experience as a kennel helper and vet technician fell into the medium exertional and unskilled category, that claimant's past work experience in retail sales fell into the light exertional and semiskilled category, that claimant's past work as a bartender fell into the light and unskilled category, that claimant's past work as a fast food employee fell into the light exertional and unskilled category, that claimant's past work as a construction worker fell into the medium exertional and low semiskilled category, and that claimant's past work as a furniture delivery person fell into the medium exertional and semiskilled category. (R. 88-89).  The VE further testified that claimant had no transferable skills.

The ALJ then asked the VE to consider a hypothetical, younger worker with a high school education, who is able to perform medium work in a low stress non-production or assembly type job that is not around the general public.  The ALJ asked the VE if any medium or light work opportunities existed that claimant could perform.  The VE suggested that at the medium exertional level, the hypothetical worker would be capable of working as a material packer, of

which approximately 4,000 positions exist in Alabama; a commercial industrial cleaner, of which approximately 30,000 positions exist in Alabama; and a hand packer, of which approximately 4,000 positions exist in Alabama. (R. 90). The VE suggested that at the light exertional level, the hypothetical worker would be capable of working as a hospital cleaner, of which approximately 30,000 positions exist in Alabama; a packer, of which approximately 4,000 positions exist in Alabama; and machine conveyor feeders, of which 1,000 positions exist in Alabama. (R. 90). The VE also stated that there are approximately 1,000 positions in Alabama for sedentary work opportunities, as a security monitor or gate tender. (R. 91).

The ALJ then asked the VE to consider that the hypothetical worker should be restricted to simple, repetitive, non-complex tasks. The ALJ asked the VE if the limitation would have any impact on the hypothetical worker's ability to perform the claimant's past relevant jobs or the medium and light jobs suggested earlier. The VE responded that the limitation would not have an impact on the hypothetical worker's ability to perform the jobs of furniture delivery person, construction worker or kennel assistant. The VE also stated that the limitation would not have an impact on the hypothetical worker's ability to perform the medium exertional level jobs of material packer, commercial industrial cleaner or hand packer; the light exertional level jobs of hospital cleaner, packer, or machine conveyor feeder; or the sedentary exertional level jobs of security monitor or gate tender. (R. 91-92).

The ALJ went on to narrow the hypothetical even further by asking the VE to consider that the hypothetical worker could only have occasional contact with coworkers and supervisors. He asked the VE if the restriction would have any impact on the hypothetical worker's ability to perform the jobs of furniture delivery person, construction worker or kennel assistant. The VE

16

responded that in those positions and the other positions previously suggested, the hypothetical

worker would have more than occasional contact with other people because she would be

working with other people around her. (R. 92-93).

Lastly, claimant's counsel questioned the VE regarding the "Medical Opinion Regarding

Ability To Do Work Related Activities (Mental)" forms completed by Drs. Ahmad and Atkins.

He asked the VE what effect, if the ALJ found the rankings and limitations on those forms to be

supported by the medical records, such limitations would have on the claimant's ability to do

claimant's past relevant work.  The VE responded that the hypothetical individual would not be

able perform the claimant's past relevant work. (R. 95-97).

*The ALJ's Decision*

On January 21, 2010, the ALJ issued a decision finding the claimant was not disabled

under the Social Security Act. (R.30).  The ALJ began by recounting the testimony and evidence

in the record as set forth above.  The ALJ found no evidence in the record that claimant

performed substantial gainful activity since August 4, 2007. (R. 29).  The ALJ found that

claimant's bipolar disorder, history of poly substance dependence, and personality disorder were

severe impairments established by the medical evidence of record; he concluded, however, that

these impairments did not singly or in combination manifest the specific signs and diagnostic

findings required by the Listing of Impairments. (R. 23, 29).

In making the step three finding under the Listing of Impairments, the ALJ analyzed

claimant's mental impairments, singly and in combination, under the "paragraph B" criteria of

listing 12.04.  First, the ALJ found that claimant had no more than moderate restriction in

activities of daily living.  He noted that she could care for her personal needs, drive, play softball,

play cards, leave the house daily, visit with family or friends daily, ride ATVs, hunt, and work on

a part-time basis.  Second, he found that claimant had no more than moderate difficulties in

social functioning.  He noted that, despite her allegations of significant difficulties in this area,

claimant's daily activities indicate no more than moderate difficulties in social functioning.

Third, the ALJ concluded that claimant's concentration, persistence or pace are not so limited as

to prevent claimant from playing softball, playing cards, preparing and cooking meals, and

working on a part-time basis.  Finally, the ALJ observed that claimant experienced no episodes

of decompensation or extended duration since the alleged onset date of disability. (R. 24, 29).

Because he found that claimant's impairments caused no combination of two marked

restrictions, or of a marked restriction and repeated episodes of decompensation of extended

duration, the ALJ concluded that these impairments did not satisfy the "paragraph B" criteria. (R.

24).  The ALJ then considered the "paragraph C" criteria, but concluded that the evidence did not

establish the presence of those factors.  He noted that these initial findings of claimant's

limitations were used to rate the severity of mental impairments at steps two and three of the

evaluation process and were not a residual functional capacity assessment.  (R. 25).

Next, the ALJ concluded that claimant retained the residual functional capacity to

perform medium work that allows for work primarily with or around things and not the general

public, in a low stress, non-production or assembly type job performing only simple, repetitive,

non-complex tasks with frequent contact with coworkers and supervisors. (R. 29).  He further

found that claimant is capable of performing her past relevant work as a furniture delivery

person, a construction worker, and a kennel worker, considering her age, education, past work

experience, and residual functional capacity. (R. 29-30).

18

To support his conclusions, the ALJ stated that "although the claimant has a long history of treatment for mental impairments, she has performed substantial gainful activity in the past and there is no indication that her condition had worsened at the alleged onset date of disability." (R. 25-26).  He stated that claimant had decided to stop working in August of 2007 because her employer cut back her hours and she had lost her temper at work and decided not to go back. (R. 25).  The ALJ went on to state that the claimant's medical records indicated that her medication has been significantly helpful in regulating her condition and that she has not experienced any significant side effects from the medication.  The ALJ specifically noted the treatment records of Dr. Bradley in September and October of 2007 that reflected that claimant was getting good results from her medication without major side effects. (R. 26).  The ALJ further provided that claimant's medications have been adjusted as necessary and her condition has remained relatively stable. (R. 26).

The ALJ further stated that the claimant's treating records from Indian Rivers since her alleged onset date of disability are inconsistent with the disabling mental limitations indicated by the forms completed by Drs. Ahmed and Atkins. (R. 26).  The ALJ reported that he was assigning little weight to the medical opinions regarding ability to do work related activities (mental) forms completed by Drs. Ahmed and Atkins because the reports were inconsistent with other medical records. (R. 27).  He specifically noted that Dr. Ahmed's May 2009 report of disabling mental limitations was inconsistent with the May 2009 emergency room records describing claimant's psychiatric complaints as moderate. (R. 27).  He also noted that Dr. Atkins's form was even less consistent with claimant's treating medical records because claimant reported to Dr. Atkins that she had had recent hallucinations when she had reported in December

19

of 2008 that she had not experienced hallucinations in seven or eight years. (R. 27).  The ALJ stated that Dr. Atkins diagnosed claimant with obsessive-compulsive disorder with Tourette's and that Dr. Atkins believed she was at risk to "harm to self;" however, claimant's other medical records do not indicate the diagnosis of obsessive-compulsive disorder or any risk to "harm to self." (R. 27).  Although she had claimed that she hurt herself in 2006 to Dr. Aftab, claimant has denied lethality towards herself and others since September 7, 2007. (R. 341-347, 350, 351, 353).

The ALJ went on to state that claimant's daily activities since the alleged onset date of disability are also not consistent with disabling mental limitations. (R. 27).  He referred to the claimant's Daily Activities Questionnaire in October 2007 in which claimant reported that she was able to care for her personal needs, tried to leave the house daily, drove, visited with friends and family, visited with her roommate's family, played softball, hunted, rode ATVs, and worked on a part-time basis for two employers. (R. 27-28).   The ALJ stated that these daily activities are inconsistent with disabling limitations.  He specifically noted that although claimant alleges an inability to get along with others, she is frequently around others in her daily activities. (R. 28).

The ALJ stated that "[a]lthough the documentary evidence establishes that the claimant has underlying medical conditions capable of producing some limitations, substantial, credible evidence as a whole does not confirm disabling limitations arising from those conditions."  The ALJ concluded that claimant retains the residual functional capacity to perform medium work which allows for work primarily with or around things and not the general public, work in a low stress non-production or assembly type job, only simple, repetitive, non-complex tasks, and frequent contact with coworkers and/or supervisors. (R. 28).

Next, the ALJ stated that he had considered the opinions of the Dr. Estock, the

nonexamining state agency psychiatrist.  He considered it significant that Dr. Estock's opinion was consistent with his own opinion even though the psychiatrist did not have access to all of the evidence that was available to the ALJ. (R. 27).

The ALJ then concluded that, based on the testimony of the VE, claimant was able to perform her past relevant work as a furniture delivery person, construction worker, and kennel worker.  (R. 28).

The Appeals Council denied claimant's request for review.  Claimant has exhausted her administrative remedies and appeals from the final decision of the Commissioner under 42 U.S.C. § 1383(c)(3).

## VI. DISCUSSION

Claimant asserts that the ALJ erred in discounting the medical opinions of Dr. Ahmad, a treating psychiatrist, and Dr. Atkins, an examining psychiatrist.  The Government responds that the ALJ had good cause to discount both Dr. Ahmad's and Dr. Atkins's opinions because neither was actually a treating source whose opinion was entitled to controlling weight and because their opinions were inconsistent with claimant's medical records as a whole as well as with her daily activities.

The basic rule of the Eleventh Circuit is that the Commissioner may reject *any* medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (emphasis added).  However, "the opinion of a *treating* physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis." *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004)(emphasis added); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The Commissioner also recognizes a

similar preference for the opinion of treating physicians:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalization.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)).

However, the ALJ may discount a treating physician's opinion or report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner,* 363 F.3d at 1159*; see also Edwards*, 937 F.2d at 583. When discounting the opinion of a treating physician, the ALJ must clearly articulate his reasons.  *Phillips v. Barnhardt,* 357 F.3d 1232, 1241 (11th Cir. 2004).

Claimant alleges that Dr. Kazi W. Ahmad was her treating psychiatrist in that he provided medical treatment to her twice, in January and February 2009, while employed at Indian Rivers, a facility from which claimant sought treatment over the course of many years.  The Government responds by claiming that Dr. Ahmad was not a treating psychiatrist of claimant because he treated claimant on only two occasions before completing the medical opinion regarding ability to do work related activities (mental) form.  However, the court needs not determine whether Dr. Ahmad qualified as a treating physician of the claimant because the ALJ may reject any medical opinion if the medical evidence of record supports a contrary finding.  The ALJ determined that the opinions of both Dr. Ahmad and Dr. Atkins were inconsistent with the whole of the medical evidence and, therefore, assigned little weight.  The ALJ stated that claimant's treating medical records from Indian Rivers indicated that she had been improving prior to September 2007 and

22

that her condition has been relatively stable since the alleged onset date of disability. The ALJ specifically cited that in May 2009, when the claimant presented in emergency room requesting Ativan and Haldol, the severity of her psychiatric complaints was described as moderate, which is inconsistent with Dr. Ahmad's May 2009 opinion that claimant's psychiatric complaints were disabling. The ALJ thus rejected the opinion of Dr. Ahmad for "good cause" as required by case law in discounting the opinion of a treating physician.

Next, the ALJ states specifically that Dr. Atkins's opinion is also inconsistent with claimant's treating medical records. He noted that in December of 2008, claimant reported she had not experienced hallucinations in seven or eight years, and more recent records form Indian Rivers also indicate no psychosis, no hallucinations, and no delusions. However, claimant reported hallucinations to Dr. Atkins in July of 2009. Further, Dr. Atkins's opinion is inconsistent with claimant's previous diagnoses. Dr. Atkins reported claimant's diagnoses to be schizoaffective disorder bipolar type with intermittent hallucinations and psychotic features, self injurious behavior, and obsessive-compulsive disorder with Tourette's Syndrome. However, the ALJ notes that claimant had never been diagnosed with obsessive-compulsive disorder at Indian Rivers and no evidence showed that she has ever been diagnosed with Tourette's. The ALJ also notes that Dr. Atkins reported claimant was at risk to "harm to self," but that none of her treating medical records indicate such a risk to "harm to self," though she had claimed to hurt herself previously to Dr. Aftab in 2006. Claimant has denied lethality towards herself and others since September 7, 2007.

In addition to stating that both Dr. Ahmad and Dr. Atkins's opinions were inconsistent with the medical evidence of record, the ALJ stated that the claimant's daily activities, as

23

provided in the Daily Activities Questionnaire, completed by claimant in October 2007, are also inconsistent with the alleged disabling mental limitations.  Claimant's counsel argues that this statement shows that the ALJ improperly substituted his judgment for that of mental health professionals by determining that her daily activities precluded a finding of disability.  However, the ALJ's statement is merely supplemental to the ALJ's finding that the opinions of Drs. Ahmad and Atkins were inconsistent with the whole of the medical evidence of record.

Claimant further alleges that the ALJ should have contacted Dr. Ahmad to resolve any inconsistencies between the form completed by Dr. Ahmad and the medical evidence of record, citing 20 C.F.R. § 404.1512(e).  However, this provision provides only that "when the evidence we receive from your treating physician [...] is *inadequate* for us to determine whether you are disabled, we will need additional information to reach a determination or decision." 20 C.F.R. § 404.1512(e) (emphasis added).  The ALJ did not find the evidence inadequate to determine whether claimant was disabled, but found sufficient evidence to the contrary, and thus, was not required to contact Dr. Ahmad to clarify any inconsistencies between the form he completed and claimant's other treatment notes.

The court further takes note of claimant's failure to appear for a consultative examination, as ordered by the ALJ.  Although the ALJ thought a consultative examination would be appropriate in this case, claimant's counsel instructed claimant not to appear because he believed the medical evidence of record to be sufficient.

The court finds that good cause exists for the ALJ's disregarding of Dr. Ahmad and Dr. Atkins's medical opinions and that he clearly and adequately articulated his reasons for doing so.  Thus, substantial evidence supports his rejection of both of their opinions.

24

## VII. CONCLUSION

The standard for reviewing the Commissioner's decision is limited.  This court does not review the Commissioner's factual determinations de novo.  This court must affirm the Commissioner's decision because the Commissioner applied the correct legal standards and the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405 (g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).  For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 30th day of November 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE